**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0624n.06
Filed: August 27, 2007

**No. 06–1975**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DIANA SUMMERLAND, as Personal Rep. of the Estate of DWAINE RINESMITH, Deceased, | ) ) ) | |
| | ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| COUNTY OF LIVINGSTON et al., | ) | |
| Defendants-Appellees. | | |

Before: KEITH, MOORE, and COLE, Circuit Judges.

**KEITH, Circuit Judge.** Plaintiff, Diana Summerland (personal representative of the estate of Dwaine Rinesmith), appeals the district court's grant of summary judgment on the basis of qualified immunity in favor of Defendants (County of Livingston and several of its officers). Because we find, *inter alia*, that the officers did not violate Rinesmith's constitutional rights, we **AFFIRM** the district court's grant of qualified immunity.

**I.**

This case arises out of the shooting death of Dwaine Rinesmith, a mentally disturbed man. At approximately 6:30 p.m. on October 5, 2002, Livingston County Sheriff Deputies Carl Smyth and Raymond Marino each responded to a 911 call that a man placed a large sign in his front yard that read "no police you be shot." (JA 395.) Deputy Smyth initially refused to respond to the call because "he did not think it was a police matter," (JA 373), but Smyth's commanding officer, Sergeant Fred

Williams, informed him that there was a mentally disturbed individual living on the property where the sign was located and that "they would need to go and check the status of the individual and find out his mental condition, as well as what his intentions were." (JA 373).

When Deputy Smyth and Deputy Marino each arrived at the scene, they encountered Dwaine Rinesmith in the window of a mobile home located on the property with the sign. Marino asked Rinesmith to exit his residence, but he refused. Deputy Smyth attempted to enter Rinesmith's property through a chained gate, but, as Smyth was unwinding the chain, Rinesmith began yelling from his window for the officers to stay out of his yard. Smyth backed off as a result.

After Marino made phone contact with Rinesmith, Rinesmith started to complain about how he was a Vietnam veteran and that "nobody appreciates him, [and] what he did for the country[.]" (JA 99.) Rinesmith also spoke of an incident that purportedly occurred two weeks prior, in which two Livingston County deputies had "beat[en] him up" in the process of transporting him to the University of Michigan Hospital for psychiatric treatment. (JA 100.) (According to Deputy Marino, Rinesmith claimed he received psychiatric treatment because "he wanted to die and he still want[ed] to die." (JA 99.)) Deputy Marino convinced Rinesmith to throw his psychiatrist's business card out of his window and to permit Marino onto the property to retrieve it. After Marino retrieved the card, he passed it to Smyth, who then attempted to contact Rinesmith's psychiatrist, while Marino continued to speak with Rinesmith.

Around this time (approximately 6:50 p.m.), Livingston County Sheriff Deputy Curt Novara arrived on the scene, positioning himself behind a bush in front of Rinesmith's mobile home. About a half hour later, Livingston County Sheriff Deputy Marc King arrived at Rinesmith's residence—whose presence profoundly agitated Rinesmith. (Apparently, Rinesmith thought that

Deputy King was the deputy who had allegedly handcuffed him too tightly during his transportation to the hospital two weeks earlier.)  Upset, Rinesmith threw his cell phone out the window and terminated communication with Deputy Marino.  Rinesmith then moved away from the window, causing Marino to lose sight of him.

According to Deputy Marino, Rinesmith returned to the window a short while later with an object that appeared to be a gun.  Deputy Marino took cover behind his patrol car—though Marino does not say (nor does anyone else) that Rinesmith actually aimed the gun at anyone.[1]  (JA 104.) One of Rinesmith's neighbors, Robert A. Rodriguez, videotaped this, (JA 426) (DVD), and later testified in his deposition that he saw what he believed to be the barrel of a rifle in Rinesmith's possession.  Deputy Novara agreed with this perception: "From observing behind the pine trees[,] I [saw] Mr. Rinesmith in the front of his mobile home holding an object horizontally[;] it appeared to be in a tube-like manner, that resembled the barrel of a long gun."  (JA 159.)

Around 7:30 p.m., Rinesmith emerged from his mobile home and, according to Deputy Novara, appeared to have a handgun in his left hand.  Deputy Novara yelled, "Gun!" and  Rinesmith began to head north on his property—in the opposite direction of the deputies, who were positioned on the south side of the property.  Deputy King, who was positioned to the southwest of Rinesmith's property at the gate of a neighboring mobile home, spotted Rinesmith and announced his presence by yelling "Livingston County Sheriff's Department."  (JA 195.)  Rinesmith responded by "turning in [King's] direction and [taking] up . . . a kneeling stance[.] . . . [I]t was a shooting position and [he]

---

[1] In contrast, the district court wrote that "Rinesmith, while still at his front window, pointed what appears to be a long-barreled rifle out the front window of his house in the direction of the Livingston County Sheriff Deputies Marino and Smyth." (Dist. Ct.'s Op. 4.)  The district court only cited to "Def.'s Ex. 5, Video Clip No. 1" in support of this proposition.  But none of the video clips that we received in the joint appendix supports this finding.

pointed [something] in [King's] direction." (JA 195.)  Deputy King later described the object as "something that appeared to be black and then something either attached to the back of it or the front of it that had a light. . . .  It would be equated to a sight on a gun." (JA 195.)  One of Rinesmith's neighbors, Bernardine Cusumano, also testified that she believed that Rinesmith was holding a gun. (JA 273–74.)

King then yelled for Rinesmith to "drop the object," (JA 195), and  Rinesmith responded by yelling, "Shoot me, Shoot me[,]" (JA 195).  Deputy King repeated his command, and, within a matter of "three [to] five seconds," Rinesmith "sat down and leaned against [a] shed [on the property], with the unknown object [on] the ground." (JA 195.)  At this point, King "'noticed that [Rinesmith] had a small wooden handle shovel with a orange end next to him.'" (JA 196.)  But, in response to the question, "Is the object he was pointing at you the same object that you identify as a shovel?," King responded, "No." (JA 196.)  (Deputy King testified that he did not identify the object that Rinesmith was pointing at him until after the day of the incident.  (JA 196.))

Around this time, Deputy Smyth finally located Rinesmith's psychiatrist, Dr. Lee Wang, and tried to get Rinesmith to speak with Dr. Wang on the phone.  Defendants contend that Rinesmith did not respond to Deputy Smyth's calls, choosing instead to quickly move toward the front portion of his mobile home.[2]   At this point, Deputy Marino was positioned at the northeast corner of the shed, and Deputy Novara was stationed at the southeast corner.  When Rinesmith came closer to Deputy Marino's position, Marino moved around the shed toward a gas meter in front of Rinesmith's mobile

---

[2] Plaintiff contends that Rinesmith began walking toward the front of the yard in order to "[r]espond[ ] to [Deputy Smyth's] calls to talk to his doctor[.]" (Plaintiff's Br. 10.)  But, in spite of Plaintiff's citation, there is nothing in the record to support the notion that Rinesmith was "[r]esponding to the calls to talk to his doctor[.]"

home.  Novara was now stationed five feet south and five feet east of Deputy Marino.

A witness, Patrick Gibson, testified in his deposition that he witnessed "[Rinesmith] running around the corner of the shed toward the officers." (JA 236.)  According to Plaintiff, another witness, David Grissom, testified that Deputy Smyth was chasing Rinesmith toward this direction. (Appellant's Br. 31; JA 388–389.)  As Rinesmith ran toward Deputy Marino and Deputy Novara, Gibson testified that "[Rinesmith] had his arms straight out in front of him as he was running.  His hands were together as if he were holding a gun."  (JA 236.)  It appeared, according to Gibson, that Rinesmith was going to "shoot the officers[.]"  (JA 236.)

Deputy Marino and Deputy Novara tell a slightly different story.  They testified in their depositions that Rinesmith began charging them with "what appeared to be an axe in his right hand[,]" not a gun.  (JA 111;  JA 174.)  At this point, Deputy Marino yelled, "stop,"[3] and "drop it," (JA 112;  JA 174); and then fired two shots when Rinesmith failed to do so.   Deputy Novara simultaneously fired two more shots at Rinesmith, causing Rinesmith to twist and land on his stomach.  (JA 176.)  Rinesmith was not given any verbal warning that deadly force would be used. (JA 120.)  Deputy King testified that he did not witness the shooting, (JA 197-98), but that he heard the command "drop the weapon" and "3 to 4 gunshots," (JA 199).

It was later determined that the distance between the gas meter in front of Rinesmith's mobile home (where Deputy Marino testified he shot from) and Rinesmith's body was 23.8 feet.  There was 18.5 feet between the shell casings from Deputy Marino's gun and Rinesmith's body, and 35 feet between the shell casings from Deputy Novara's gun and Rinesmith's body.

---

[3] Plaintiff contends that Rinesmith was actually the one to yell "stop" at the deputies, not vice versa.  However, as the district court noted, there is no evidence to support this proposition. (Dist. Ct.'s Op. 12 n.2.)

Immediately after the shooting, Deputy Marino and Deputy Novara testified that they approached Rinesmith and moved three objects (a shovel, "a metal L-shaped bracket, and "a plastic framing square") away from Rinesmith.  Although a witness (David Grissom) testified that he did not recall seeing Rinesmith's body moved, (JA 384-85), Marino and Novara testified that they turned Rinesmith's body over as he was "taking deep breaths[,]"  (JA 176).  EMS was called, but neither Marino, Novara, nor King rendered first aid to Rinesmith.   King later testified that he was trained in treating gunshout wounds and that there was an emergency first aid kit in his police cruiser, but he believed that it would not have been beneficial to attempt to treat Rinesmith's wounds at that point. (JA 203.)  Shortly thereafter, Rinesmith died on the scene.

On October 5, 2004, Plaintiff (on behalf of Rinesmith's estate) filed this 42 U.S.C. § 1983 action against Livingston County, Deputy Curt Novara, Deputy Marc King, and Deputy Raymond Marino, alleging (1) "Fourth Amendment Violations Defendants Marino and Novara"; (2) "Gross Negligence–Defendants King, Marino and Novara"; (3) "Danger Creation Defendant King"; (4) "State Law Violations–Assault and Battery Defendants Marino and Novara"; and (5) "Constitutional Violations–County of Livingston." (JA 15–17.)  Count III ("Danger Creation") was later dismissed by Plaintiff.  (Dist. Ct.'s Op. 1 n.1.)  She also sought to amend her Complaint to include two additional claims:  (1) a First Amendment retaliation claim and (2) a claim of deliberate indifference to a serious medical condition.  Defendants moved for summary judgment on the basis of qualified immunity.

On June 19, 2006, the district court granted Defendants' motion for summary judgment.  The court concluded that, "[u]nder the totality of circumstances, the deputies' actions were reasonable[,]" (Dist. Ct.'s Op. 12); and, therefore, they are entitled to qualified and governmental immunity.  With

respect to the County's liability, the district court reasoned that "the need for more or different training was not so obvious that the inadequacy was likely to result in the violation of constitutional rights, such that the County can reasonably be said to have been deliberately indifferent to the need for more training." (Dist. Ct.'s Op. 15.)  The court also denied Plaintiff's request to amend the Complaint to include a First Amendment retaliation and a deliberate indifference claim.   Finally, the court struck one of Plaintiff's experts' reports from the record, concluding that it contained numerous "legal conclusions." (Dist. Ct.'s Op. 17.)  Plaintiff filed a timely Notice of Appeal.

**II.**

The Complaint alleges violations of § 1983 and state law, and therefore the district court had subject matter jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.   Because the district court's grant of summary judgment in favor of Defendants constitutes a "final judgment," and because Plaintiff filed a timely Notice of Appeal, this Court has jurisdiction to review the district court's judgment under 28 U.S.C. § 1291.

**III.**

Our Court reviews a district court's grant of summary judgment *de novo*.  *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.  56(c).  The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the non-moving party must make a "showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  The non-moving

party must present some evidence in support of its complaint to defeat a motion for summary

judgment, and show that a genuine issue for trial exists—i.e., that a reasonable jury could return a

verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### Count I: Excessive Force Claim—Deputy Novara and Deputy Marino

With respect to Plaintiff's excessive force claim, the first issue that we must address is

whether Defendants are entitled to qualified immunity.

### 1.  Qualified Immunity Standard

"Qualified immunity provides 'that government officials performing discretionary functions

generally are shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'"

*Champion v. Outlook Nashville, Inc.*, 380 F. 3d 893, 900 (6th Cir. 2004) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)).  Our Court has developed a three-step analysis for assessing

qualified immunity defenses:  We determine (1) "whether, based upon the applicable law, the facts

viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred";

(2) "whether the violation involved a clearly established constitutional right of which a reasonable

person would have known"; and (3) "whether the plaintiff has offered sufficient evidence to indicate

that what the official allegedly did was objectively unreasonable in light of the clearly established

constitutional rights."  *Id.* at 901.  "If the answer to all three questions is 'yes,' qualified immunity

is not proper."  *Id.*

### 2.  Application

Under the first step of the qualified immunity defense, "we consider whether the facts, when

taken in the light most favorable to the plaintiff[ ], demonstrate the occurrence of a constitutional violation." *Id.* As noted, Plaintiff contends that Deputy Marino's and Deputy Novara's force against Rinesmith was excessive. The Supreme Court has held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). The parties do not dispute that Rinesmith was "seized" at the time of the shooting, and, indeed, Fourth Amendment jurisprudence supports this agreement. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). Hence, the Fourth Amendment's "reasonableness" standard applies to the instant case.

That standard is an objective one, requiring the Court to perform "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The ultimate question is "whether the totality of the circumstances justified a particular sort of search or seizure." *Garner*, 471 U.S. at 8–9.

With these considerations in mind, our prior cases have made clear that "the use of deadly force is only constitutionally reasonable if the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (internal quotation marks omitted). And thus the question becomes whether

Rinesmith objectively posed a serious threat to the deputies or anyone else.  Plaintiff contends that

Rinesmith did not; that he was simply running away from Deputy Smyth, who had chased Rinesmith

around the corner of the shed, when he was shot by Deputy Marino and Deputy Novara.

(Appellant's Br. 31.)  Deputy Smyth denies that he chased Rinesmith into Marino and Novara's

direction.  He contends that he was speaking with Dr. Wang in his vehicle until he heard shots fired.

(JA 141.)

To be sure, this is a disputed fact, but it is not material.  Either way, it would be clear that

Rinesmith posed a serious threat to Marino and Novara.  And though the witnesses' perspective (that

Rinesmith was "going to shoot" the officers) differs from the officer's perspective (that Rinesmith

was charging them with "an axe"), either scenario would give a reasonable officer probable cause

to believe that Rinesmith posed a "threat of serious physical harm."  There is no evidence to support

Plaintiff's contention that "Rinesmith was unarmed and posed no threat to Defendants[.]"[4]

(Apellant's Br.  33.)    Therefore, even if Deputy Smyth was in fact chasing Rinesmith into the

---

[4] Plaintiff makes some serious misrepresentations in her brief in an attempt to support her position.  For example, she contends that "[i]ndependent witness Gibson . . . reported that Rinesmith had nothing in his hands and was not threatening the officers with an axe raised above his head as he came around the shed where [the] Deputies . . . were hiding."  (Appellant's Br. 31.)  Plaintiff cites nothing to support this— and for good reason:  Patrick Gibson testified in his deposition that "'[he] didn't notice whether or not [Rinesmith] had a gun,'" (JA 236), but "[Rinesmith's] hands were together as if he were holding a gun [and] would shoot the officers[.]" (JA 236.)  Patrick Gibson's wife, Dorithy Gibson, also reported a similar observation: "[Rinesmith] came aroun[d] the shed and he was running, coming toward the officers, he had what I believe to be a gun in his hand, the officers yelled at him to stop but he didn't.  It looked to me that [Rinesmith] started to raise his hand with the gun so they shot him." (JA 323.)

Plaintiff's brief also states that "[i]ndependent witness Cusumano testified that Rinesmith did not have his arm raised above his head threatening the officers with an axe." (Appellant's Br. 31.)  Again, Plaintiff provides no supporting citation for this proposition, and a review of Cusumano's deposition actually reveals that she could not see Rinesmith's hands at all:  "Q: . . . When [Rinesmith] was running around, you couldn't see his hands, correct?  A: Right." (JA 281.)

deputies' direction (which the Court must assume for summary judgment purposes), there was nevertheless probable cause to believe that Rinesmith posed a "serious physical threat" to Marino's and Novara's safety as he fled from Deputy Smyth—thereby justifying deadly force.

Plaintiff points to several details to support her position.  First, Plaintiff points to the distance from which the deputies shot Rinesmith:  Deputy Marino was approximately 23.8 feet from Rinesmith; Deputy Novara was approximately 35 feet from Rinesmith.  But, even still, the deputies were faced with an aggressive individual who (1) posted a sign threatening, "no police you be shot," (2) had earlier brandished an object that appeared to be a shotgun, and (3) had begun charging toward the deputies' direction, which not only minimizes the significance of the 23.8 feet distance between Deputy Marino and Rinesmith but forced the deputies to make a "split-second judgment."  *See Sample*, 409 F.3d at 697 ("[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").  And the deputies faced all this in the dark.[5]

Second, Plaintiff contends that "Defendants did not have probable cause to arrest Rinesmith for any crime." (Appellant's Br. 33.)  Yet it is unclear why this matters:  Even if the deputies had no justifiable reason "to arrest Rinesmith for any crime," this would not have given Rinesmith a free pass to threaten the deputies with "serious physical harm."  *See Boyd v. Baeppler*, 215 F.3d 594, 600 (6th Cir. 2000) ("[Whether plaintiff committed a crime] is wholly immaterial to the issue of whether [he] presented a threat to [the] officers[.]").

---

[5] It is true that Deputy Novara was farther from Rinesmith than Deputy Marino was.  But his two shots were justified to protect Deputy Marino's safety, if not to protect his own.

Next, quoting *Champion*, 380 F.3d at 904, Plaintiff correctly points out that "[t]he diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted." (Appellant's Br. 26) (internal quotation marks omitted); *see also Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed."). Notably, however, these cases involved mentally disturbed individuals who were unarmed. Rinesmith, by contrast, was armed with (and aiming) what the deputies perceived to be an axe and witnesses perceived as a gun. And, unfortunately, Rinesmith's diminished capacity did not make him any less of a serious threat to the deputies in light of these other circumstances. *See, e.g.*, *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) (extending qualified immunity to officer who shot a mentally disturbed individual who, "[a]rmed with a butcher knife, . . . suddenly burst out of the kitchen and lunged at [an] Officer[.]").

Finally, Plaintiff points out that "[Rinesmith] was shot without warning that deadly force would be used. He was shot immediately after Defendants yelled 'stop' and given no time to comply." (Appellant's Br. 33.) Plaintiff gives no supporting factual or legal citation for these propositions. And our review of the evidence does not show that Rinesmith was not given a reasonable "time to comply" under the circumstances. Rather, the evidence shows that Rinesmith was charging directly at Marino and Novara, and that they yelled "stop" and "drop the weapon" with their guns pointed in his direction— thereby giving Rinesmith a definite (though not verbal) warning of the probable result. *See Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991) (extending qualified immunity despite the fact that the deputies gave no warning of deadly force, only "several warnings to halt[.]").

Accordingly, because the facts viewed in a light most favorable to Plaintiff show that Rinesmith posed a "threat of serious physical harm," there was no "unreasonable seizure" under the Fourth Amendment—and thus no "constitutional violation" under the first inquiry of the qualified immunity standard. The Supreme Court has held that "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Hence, the Court need not proceed to the second inquiry—"whether the violation involved a clearly established constitutional right of which a reasonable person would have known"— under the qualified immunity standard.[6]

**Count II:  Gross Negligence Claim — Deputies Marino, Novara and King**

Plaintiff argues that "the facts of this case are sufficient to allow a reasonable jury to infer that Defendant Marino and Novara's actions constituted gross negligence [under Michigan law, and that] Defendant King's failure to notify the other deputies that Rinesmith was unarmed is clearly reckless in light of the circumstances present that evening." (Appellant's Br. 40.) Defendants assert governmental immunity under Michigan law, which provides that governmental officials, acting in the scope of their employment, are immune from tort liability unless the official's conduct

---

[6] In any event, it is reasonably clear that, had the deputies violated Rinesmith's constitutional rights because they should have waited until Rinesmith moved closer than 23 feet, the law is not (and was not) "clearly established" on this point. *See Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) ("Within a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed."); *cf. DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 429 (6th Cir. 2006) (unpublished) (extending qualified immunity where defendant-officer shot a gun-toting suspect from "25-30 feet"). And, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent and those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citation omitted).

"amount[s] to gross negligence that is the proximate cause of the injury[.]" Mich. Comp. Laws Ann. § 691.1407(2)(c) (West 2000).

As concluded, even when viewing the facts in a light most favorable to Plaintiff, Marino's and Novara's shots were not objectively unreasonable. It follows *a fortiori* that they did not commit "gross negligence," and thus are entitled to governmental immunity (since they were acting within the scope of their authority). *Id.* § 691.1407(2).

There is likewise no genuine issue of material fact as to whether Deputy King was grossly negligent for "fail[ing] to notify the other deputies that Rinesmith was unarmed[,]" (Appellant's Br. 40), for there is no evidence that Deputy King knew this to be true. In fact, Deputy King testified that Rinesmith had earlier pointed "something that appeared to be black" with a small light "equated to a sight on a gun" in his direction, (JA 195), and that he was unable to observe Rinesmith's conduct immediately prior to the shooting. (JA 198). Hence, assuming that this allegation would even amount to "gross" negligence (as opposed to ordinary negligence), Plaintiff has not made a "showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. For this reason, Deputy King is also entitled to governmental immunity.

**Count IV: Assault and Battery Claim**

In Count IV, Plaintiff contends that "Defendants [Marino and Novara] intended to cause a harmful and/or offensive conduct[.]" (Compl. ¶ 72.) In support of this allegation, Plaintiff argues, in full, "[a]s previously set forth . . . , Defendants did not use reasonable force when they shot an unarmed, mentally ill man, in his own backyard, who was not a threat of serious bodily harm or

death." (Appellant's Br. 40.)  Insofar as Plaintiff solely relies on arguments that have already been rejected, Count IV should likewise be rejected.  *See also Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. App. 1984) ("Government actions which would normally constitute intentional torts are protected  by governmental immunity if those actions are justified.").

### Count V:  Inadequate Training— Livingston County

Next, Plaintiff argues in Count V that Livingston County provided inadequate training to the deputies in apprehending mentally disturbed individuals.  (Compl. ¶ 77.)  "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).   "In resolving the issue of a city's liability, the focus must be on [the] adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 390.

Plaintiff's claim fails for two reasons:   First, for the reasons explained above, Plaintiff has not established that the deputies committed a constitutional violation.  And, "[i]f no constitutional violation by the individual defendants is established, [a] municipal[ity] cannot be held liable under § 1983." *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2002).  Second (and notwithstanding), Plaintiff has not identified in which ways the County inadequately trained the deputies—other than to say that "Defendants testified that they did not receive any training in apprehending mentally ill persons," (Appellant's Br. 39), an assertion that fudges the deputies' testimonies, (JA 151; JA 92).

Moreover, whether these particular deputies received adequate training is only part of our

inquiry:  "In resolving the issue of a city's liability, the focus must be on [the] adequacy of the training program[,]" *Harris*, 489 U.S. at 390, in order to show (1) that it is inadequate; (2) that the inadequacy is the result of deliberate indifference; and (3) that the inadequacy is "closely related to or actually caused the plaintiff's injury." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Plaintiff has not attempted to meet any of these requirements and, therefore, has "fail[ed] to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 323.   Summary judgment in the County's favor was proper.

## IV.

## Amendments to Complaint

Plaintiff also appeals the district court's denial of her request to amend the Complaint to add (1) a First Amendment retaliation claim (arguing that the officers killed Rinesmith in retaliation of the sign in his front yard), and (2) a deliberate indifference claim (arguing the deputies were deliberately indifferent to Rinesmith's serious medical needs).

Federal Rule of Civil Procedure 15(a) provides, in relevant part, that "[a] party may amend the party's pleading only by leave of court . . . and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).   "[C]ourts should consider undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005).  A district court's decision to deny a request for amendment is reviewed for abuse of discretion. *Id.*  But, "when the district court bases such a denial on the fact that the amendment would be futile, [this Court] review[s] the decision *de*

*novo.*" *Id.*

## A.  Retaliation Claim

With respect to the retaliation claim, the district court concluded that "[t]here is absolutely no evidence that Rinesmith was shot because he posted [the] sign in his front yard[,]" and "[a]llowing leave to amend to file a First Amendment retaliation claim would be futile." (Dist. Ct.'s Op. 17.)  The district court is correct.  Other than a single conclusionary and unsubstantiated remark, (Appellant's Br. 44), Plaintiff has not offered a scintilla of evidence that the deputies shot Rinesmith in retaliation of the sign in his front yard.  Therefore, an amendment on this claim would indeed be futile.

## B.  Deliberate Indifference Claim

Neither has the district court abused its discretion in denying Plaintiff's request to include the deliberate indifference claim.  As the district court noted, "the timing of the request for leave to amend, which occurred in response to a motion for summary judgment, and after discovery has been closed for months, [amounts to] undue delay, and [would be] prejudicial to the other side." (Dist. Ct.'s Op. 17.)  *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (noting that "[a]llowing amendment at this late stage in the litigation would create significant prejudice to the defendants in having to reopen discovery and prepare a [new] defense[.]").    Moreover, as in *Duggin*, Plaintiff was "obviously aware of the basis of the [deliberate indifference] claim[,]" and offers no justification for the extended delay.  *Duggins*, 195 F.3d at 834.

## V.

### Expert Report

Finally, Plaintiff challenges the district court's decision to strike the report of one of her experts, Dr. Clinton Donaldson.  (Dist. Ct.'s Op. 17.)  In a hearing on April 26, 2006, the district court reasoned that "the [report] . . . determines or opines that reasonable force was not used.  I think that it is inappropriate . . . to have this expert's interpretation of what went on.  So I'm not going to allow it at this point."  (Summ. J. Hr'g Tr. 25, April 26, 2006.)  Plaintiff concedes that paragraphs 38 and 44 in Donaldson's report contain improper legal conclusions,[7] *see Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994), but she argues that "the District Court should have struck only those two paragraphs containing legal conclusions and considered the remainder of Dr. Donaldson's report."  (Appellant's Br. 43.)

Because we are affirming the district court's dismissal of this matter, this issue is moot, and, thus, we need not decide it.   In any event, a review of the report shows that, in addition to paragraphs 38 and 44, the report is riddled with legal conclusions. (Donaldson's Aff. 9–11.)  For example, in paragraph 36, Donaldson states, "[i]t is my opinion that there was no reasonable cause for the officers to enter upon the private property of Rhinesmith [sic] who was exercising his First Amendment rights by his posting." (Donaldson's Aff. 9.)  Paragraph 49 states, in part: "It is unlawful to shoot an unarmed, mentally ill man, running away from danger, on his property, who had not committed a crime." (Donaldson's Aff. 10.)  Paragraph 51 opines: "[T]he Livingston County Sheriff Department willfully, intentionally and recklessly created an extremely

---

[7] Paragraph 38 provides: "It is my opinion that Officer King was grossly negligent and overtly reckless in not broadcasting to the other Defendants that Rhinesmith [sic] was unarmed." (Donaldson's Aff. 9.)
Paragraph 44 provides: "It is my opinion that Deputy King was deliberately indifferent by willfully refusing to broadcast that Rhinesmith [sic] was carrying a small shovel which he had abandoned." (Donaldson's Aff. 10.)

dangerous/fatal situation by dispatching unsupervised and untrained deputies to the scene of an incident that the on duty supervisor expressed reservation about the deputies [sic] ability to handle such a potentially dangerous situation." (Donaldson's Aff. 11.)  And there are many more instances of this sort.

Therefore, because experts may only "state[ ] opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue[,]" *Berry*, 25 F.3d at 1353, and because Donaldson's report goes beyond this point (many times over), the district court's decision to strike his entire report was not erroneous.

## VI.

For the reasons stated, the Court **AFFIRMS** the district court's grant of summary judgment in favor of Defendants; **AFFIRMS** the district court's denial of Plaintiff's requests to amend her complaint; and **AFFIRMS** the district court's striking of the expert report.