[Cite as *Summerville v. Forest Park*, 195 Ohio App.3d 13, 2011-Ohio-3457.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| SUMMERVILLE, | : | APPEAL NO. C-090708 |
| | | TRIAL NO. A-0707973 |
| Appellee, | : | |
| | | *D E C I S I O N.* |
| vs. | : | |
| | | |
| CITY OF FOREST PARK ET AL., | : | |
| | | |
| Appellants. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed and Final Judgment Entered

Date of Judgment Entry on Appeal:  July 15, 2011

Law Office of Marc Mezibov, Marc D. Mezibov, and Susan M. Lawrence, for appellee.

Schroeder, Maundrell, Barbiere & Powers and Lawrence E. Barbiere, for appellants.

**SYLVIA SIEVE HENDON, Judge.**

{¶1}    The Ohio Supreme Court reversed this court's dismissal of the appeal by defendants-appellants, the city of Forest Park, Adam Pape, and Corey Hall, of the trial court's denial of summary judgment in their favor on claims made by plaintiff-appellee, Leola Summerville, under Section 1983, Title 42, U.S.Code.[1]  The case was remanded to this court for determination of the appeal on the merits.

{¶2}    The action stemmed from the death of Summerville's husband, Roosevelt, after he had been shot by Pape and Hall, two Forest Park police officers. Summerville, individually and in her capacity as administrator of her husband's estate, filed a complaint against Forest Park, Pape, and Hall, asserting causes of action for (1) excessive use of force under Section 1983, (2) deliberate indifference in failing to provide adequate medical care under Section 1983, (3) deliberate indifference in failing to adequately train under Section 1983, (4) wrongful death under R.C. 2125.01, (5) negligent infliction of emotional distress, and (6) loss of consortium.

{¶3}    The officers moved for summary judgment, arguing that they were entitled to immunity under R.C. Chapter 2744 on the state-law claims and to qualified immunity on the federal claims.  The city also moved for summary judgment, arguing that it was entitled to immunity on the state-law claims and that it was not liable for the officers' conduct with respect to the federal claims.

{¶4}    The trial court granted summary judgment in favor of the city and the officers on the state-law claims and on the Section 1983 claim for deliberate indifference in failing to provide adequate medical care.  The court denied summary judgment to the officers with respect to Summerville's excessive-force claim.  It also denied summary judgment to the city with respect to the claim for deliberate indifference in failing to adequately train.

---

[1] *Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, 943 N.E.2d 522.

{¶5}    We dismissed the appeal by the city and the officers of the trial court's decision.  In its opinion reversing this court's dismissal, the Ohio Supreme Court held that "[a]n order denying a motion for summary judgment in which an employee of a political subdivision [has] sought immunity from claims brought under Section 1983, Title 42, U.S.Code is a final, appealable order pursuant to R.C. 2744.02(C)."[2]

### *Background Facts*

{¶6}    On September 15, 2005, Detective Adam Pape of the Forest Park Police was dispatched to a residence for a "possible suicide, inside the bedroom with blood coming out."  A life squad was on its way to the same residence.  Within two or three minutes, Pape arrived at the home, where he was met by a distraught Leola Summerville.

{¶7}    Summerville told Pape that Roosevelt was upstairs.  As Pape reached the top of the stairs, he could hear the sound of gurgled breathing.   He turned to his right and saw Roosevelt lying on the floor of a bedroom at the end of the hallway.  Roosevelt was lying on his back, with his feet near the bedroom door.

{¶8}    As Pape approached, he saw that Roosevelt was clutching with his right hand a knife that protruded from the left side of his chest.   Pape radioed for the life squad to "expedite."  Roosevelt pulled the knife from his chest and began to plunge it into his chest repeatedly, despite Pape's commands for him to stop.  Pape used his Taser on Roosevelt, but Roosevelt used his left hand to pull one of the Taser's barbs from his chest.  According to Pape, Roosevelt showed no indication that he felt pain from either the stabbing or the Taser barbs.

{¶9}    By that point, Forest Park Officer Corey Hall had arrived at the home and was standing in the hallway behind Pape.

---

[2] Id., syllabus.

{¶10} After pulling out the Taser barb, Roosevelt started to stand up. According to Pape, Roosevelt fixed his gaze directly on him. Pape testified that "it was obvious that he was angry that I had deployed the Taser." Pape kept yelling at him to stay down. But Roosevelt got to his feet, still holding the knife in his hand, and began moving towards Pape.

{¶11} Pape backed out of the bedroom and pulled the door shut to establish a barrier between Roosevelt and himself, Hall, and Summerville. Then, to put distance between himself and the closed door, Pape stood in the doorway of an adjacent bedroom.

{¶12} Within seconds, Roosevelt opened the bedroom door that Pape had shut. He was holding the knife in his right hand over his shoulder in a threatening manner. The knife's blade was pointed in a downward stabbing position. He was about five or six feet away from Pape.

{¶13} Both officers began yelling at Roosevelt to drop the knife. But Roosevelt lunged toward Pape, raising the knife higher. Roosevelt had taken a step and a half in Pape's direction when Pape and Hall simultaneously fired their guns at Roosevelt, killing him.

{¶14} An autopsy revealed that Roosevelt had sustained four gunshot wounds, 11 penetrating stab wounds, and three superficial stab wounds. In addition, a barb from a Taser gun was removed from his abdomen.

### *Assignments of Error*

{¶15} In two assignments of error, the city and the officers now argue that the trial court erred (1) by not granting summary judgment to the officers on the basis of qualified immunity on the Section 1983 claims and (2) by not granting summary judgment to the city on the Section 1983 claim against it.

{¶16} We review a trial court's grant of summary judgment de novo.[3] Summary judgment is proper if " '(1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing [the] evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party.' "[4]

### A. Qualified Immunity

{¶17} Qualified immunity shields a government official from civil liability unless (1) the official violated a statutory or constitutional right and (2) that right was "clearly established" at the time of the challenged conduct.[5] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[6]

{¶18} The plaintiff bears the burden of showing that government officials are not entitled to qualified immunity.[7] If the plaintiff fails to demonstrate that a constitutional right was violated or that the right was clearly established, she will have failed to carry her burden.[8]

### 1. No Constitutional Violation Occurred

{¶19} Claims that law enforcement officers have used excessive force are governed by the Fourth Amendment's "objective reasonableness" standard.[9]

---

[3] *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.
[4] *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243, quoting *Grafton*, 77 Ohio St.3d at 105, 671 N.E.2d 241.
[5] See *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 818, 102 S.Ct. 2727.
[6] *Pearson v. Callahan* (2009), 555 U.S. 223 , ____, 129 S.Ct. 808, 815.
[7] *Untalan v. Lorain* (C.A.6, 2005), 430 F.3d 312, 314.
[8] *Chappell v. Cleveland* (C.A.6, 2009), 585 F.3d 901, 907.
[9] *Graham v. Connor* (1989), 490 U.S. 386, 395, 109 S.Ct. 1865.

Application of the test for reasonableness "requires careful attention to the facts and circumstances of each particular case."[10] The use of deadly force is reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."[11]

{¶20} In determining the reasonableness of an officer's use of force, courts must judge the situation "from the perspective of a reasonable police officer on the scene, rather than with the 20/20 vision of hindsight."[12] Courts must allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."[13]

{¶21} In the summary-judgment context, "*if* there is some evidence—more than a mere scintilla of evidence—that [the decedent], through his conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause to believe that he posed a serious threat of harm, a genuine fact dispute is created."[14] But " 'the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.' "[15]

{¶22} Pape and Hall argue that the evidence demonstrated that they did not violate Roosevelt's constitutional rights. They contend that the circumstances had clearly established probable cause to believe that serious harm was imminently threatened and that their use of deadly force in self-defense was justified.

{¶23} In support of their summary-judgment motion, Pape and Hall offered the opinion of Joseph J. Stine, an expert in the training, practices, and procedures used

---

[10] Id. at 396.
[11] *Tennessee v. Garner* (1985), 471 U.S. 1, 11, 105 S.Ct. 1694.
[12] *Graham*, 490 U.S. at 396.
[13] Id. at 396-397.
[14] (Emphasis sic.) *Chappell*, 585 F.3d at 909.
[15] (Emphasis sic.) *Scott v. Harris* (2007), 550 U.S. 372, 380, 127 S.Ct. 1769, citing *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 247-248, 106 S.Ct. 2505.

by police in the performance of their duties. According to Stine, police officers are trained that when they encounter a person who is armed with a knife and is deemed a threat, the officers should maintain a "reactionary gap of 21 feet between themselves and the person with the knife." If a suspect with a knife is within the "21 foot reactionary gap," the suspect can stab or cut an officer before the officer has a chance to defend himself. Stine opined that in this case, the officers had been even more vulnerable to attack because Roosevelt had been only a few steps away when he had lunged at them. According to Stine, Pape and Hall had acted in accordance with professional police practices and procedures and within accepted guidelines for the use of deadly force.

{¶24} On the other hand, Summerville argues that a genuine issue of fact remained as to whether the officers' use of force was unreasonable and excessive. First, she points to her own testimony that she had not seen Roosevelt rise from his position on the ground and that she had not heard the bedroom door being shut or reopened. But her testimony presented no genuine issue of material fact.

{¶25} Summerville testified that when she had gone upstairs, she saw her husband lying on the bedroom floor, stabbing himself. At that time, Pape had instructed her to go into the bathroom. She had acquiesced and had closed the bathroom door behind her. From the bathroom, she had heard the officers repeatedly instruct Roosevelt to drop the knife.

{¶26} At one point, Summerville testified, she had opened the bathroom door and had seen Pape standing immediately outside the bathroom, holding a Taser. She testified that she had not known whether Roosevelt was still on the ground at that time because she did not look into the bedroom. She had then closed the bathroom door and, within a minute, had heard four or five gunshots.

{¶27} Summerville's testimony in no way contradicted the officers' testimony with respect to Roosevelt's actions immediately preceding the shooting. Her testimony

did not dispute the officers' testimony that Pape had shut the bedroom door and that Roosevelt had lunged at Pape. Whether or not Summerville had seen Roosevelt get up or had heard the bedroom door being moved was immaterial to the determination of whether the officers had reasonably believed that Roosevelt posed an imminent risk of serious harm to them or to her.

{¶28} Summerville also points to the report of her expert witness, Gary Rini, a forensic-science consultant, who opined that (1) the autopsy description of the bullet path of "gunshot wound #1" precluded the possibility that Roosevelt's right arm had been "raised upright, and facing the officers," at the time he had sustained the wound; (2) based upon the width of the bedroom doorway and Roosevelt's final resting place on the bedroom floor, Roosevelt was inside the bedroom at the time he sustained his fatal gunshot wounds; and (3) based upon the autopsy's description of the bullet wounds through the body, and upon the officers' statements that they had fired their weapons at the same time, Roosevelt "could not have been standing upright, facing Pape and Hall, when he sustained his fatal gunshot wounds."

{¶29} None of Rini's opinions created a genuine issue of material fact. Rini's opinion that Roosevelt's right arm could not have been "raised upright, and facing the officers" at the time that he had sustained "gunshot wound #1" was of no consequence because neither officer testified that Roosevelt's right arm had been raised in an upright position "facing" them. Hall testified that as Roosevelt had started toward Pape, "his torso leaned forward and the knife began to raise higher above his head and shoulders." Pape testified that Roosevelt's hand was above his shoulder and then went higher as he lunged. Moreover, even taken at face value, Rini's statement does not contradict the officers' testimony that Roosevelt was holding a knife as he advanced toward them in an aggressive manner.

{¶30} Rini's opinion that Roosevelt had been inside the master bedroom when he sustained his fatal gunshot wounds was immaterial as well. Pape testified that after

having been shot, Roosevelt "fell back into the bedroom almost into the exact same position he was when [Pape] initially came up the stairs." Hall testified, "[M]y handgun was still up and he was gone – which means [Roosevelt] dropped out from below – then when I brought my handgun back down, I saw him on the ground." Even if it was true that Roosevelt had not fully exited the bedroom before being shot, the officers' uncontroverted testimony was that Roosevelt had been five to seven feet from Pape when he lunged one or two steps toward him and that both officers had believed that serious harm was imminent.

{¶31} Finally, Rini opined, "Based on the description of the bullet wounds provided in the autopsy, and the officers' statements that 'I think we shot at the very same time,' Mr. Summerville could not have been standing upright, facing Pape and Hall, when he sustained his fatal gunshot wounds." But Hall testified that Roosevelt's torso was bent forward. When Pape was asked whether Roosevelt had been "standing straight up," Pape responded, "He was lunging. * * * [H]is right foot [was] forward." When asked if Roosevelt's weight was forward, Pape answered, "Yes." Neither officer had testified that Roosevelt had been standing upright when he was shot, so Rini's opinion on that point was irrelevant. Moreover, the uncontradicted autopsy report, relied on by Rini in forming his opinion, explicitly described the four gunshot wounds as having entered the front of Roosevelt's body, thus supporting the officers' contention that he had been advancing toward them.

{¶32} The relevant and undisputed testimony of the officers was that their attempts at controlling Roosevelt with nonlethal force—verbal commands and a Taser—had failed. Roosevelt had shown no signs of pain when he was stabbing himself or when he was struck by the Taser barbs. When he got up, he was holding a knife in a stabbing position while ignoring the officers' commands to drop the knife. He lunged toward Pape, who stood just a few feet away, and both officers believed that Roosevelt

presented an imminent risk of death or serious injury to themselves and to Summerville.

{¶33} Summerville failed to adduce evidence refuting the officers' account of the circumstances they confronted. Consequently, Summerville failed to present a genuine issue of material fact on her claim that Pape and Hall had violated Roosevelt's Fourth Amendment right to be free from unreasonable seizure. Moreover, she failed to demonstrate that they were not entitled to qualified immunity.

{¶34} Therefore, we hold that Pape and Hall are entitled to qualified immunity on Summerville's Section 1983 claims against them. We sustain the first assignment of error and enter judgment for both Pape and Hall on those claims. Because Summerville has not shown that Pape and Hall used excessive force in shooting at Roosevelt, we need not address whether Roosevelt had a "clearly established" right to be free from being fired upon.

### B. No Liability for the City

{¶35} Because Summerville failed to establish that the officers had committed a constitutional violation, the city of Forest Park cannot be held liable under Section 1983.[16] Accordingly, we sustain the second assignment of error and enter judgment in favor of Forest Park on Summerville's failure-to-train claim under Section 1983.

Judgment accordingly.

SUNDERMANN, P.J., and CUNNINGHAM, J., concur.

---

[16] *Summerland v. Livingston* (C.A.6, 2007), 240 Fed.Appx. 70, 79; *Los Angeles v. Heller* (1986), 475 U.S. 796, 799, 106 S.Ct. 1571.