*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0467p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

ROMEO V. UNTALAN, Individually and as
Administrator of the Estate of Ronnie C. Untalan;
CORAZON UNTALAN,

          *Plaintiffs-Appellants,*

    *v.*

CITY OF LORAIN, et al.,

          *Defendants-Appellees.*

No. 04-4489

———————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-00205—Dan A. Polster, District Judge.

Argued: November 2, 2005

Decided and Filed: December 7, 2005

Before: MARTIN, NELSON, and ROGERS, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Paul B. Daiker, ZUKERMAN, DAIKER & LEAR, Cleveland, Ohio, for Appellants. Todd M. Raskin, MAZANEC, RASKIN & RYDER, Cleveland, Ohio, for Appellees. **ON BRIEF:** Paul B. Daiker, ZUKERMAN, DAIKER & LEAR, Cleveland, Ohio, for Appellants. Todd M. Raskin, Carl E. Cormany, MAZANEC, RASKIN & RYDER, Cleveland, Ohio, for Appellees.

———————

## OPINION

———————

ROGERS, Circuit Judge. This is a § 1983 action for the use of deadly force arising out of the fatal shooting by police of a schizophrenic who, seconds before being shot, attacked a police officer with a butcher knife. The Plaintiffs-Appellants in this case, Romeo and Corazon Untalan, are the parents of the decedent Ronnie Untalan. They seek to vindicate Ronnie's Fourth and Fourteenth Amendment right not to be killed by the police. They are suing Lorain police officer Joseph Kopronica, who shot Ronnie, and the City of Lorain, for its alleged failure to appropriately train its officers. The Untalans appeal the district court's grant of summary judgment in favor of Officer Kopronica on grounds of qualified immunity. Likewise, they appeal the dismissal of their suit against the City. The district court threw out the suit against the City because Officer Kopronica was found not to have violated the decedent's constitutional rights. We affirm the district court's

1

judgment because no rational juror could find that Officer Kopronica violated the decedent's constitutional rights.

## I.

On January 30, 2002, Ronnie Untalan, who suffered from schizophrenia, grabbed a butcher knife while at home with his mother, Corazon. Ronnie's actions alarmed Corazon. Corazon called 911 for help. Ronnie's father, Romeo, tried to calm Ronnie. After Corazon called the police, Ronnie used a waist-level cart to barricade himself in the kitchen. At about 10:42 p.m., Lorain police officers Gedling and Kopronica, responding to the call for help, arrived at the Untalans' home. Officer Kopronica stood near the kitchen doorway so that he could talk to Ronnie. Officer Gedling could see Ronnie through a rear window. Officer Kopronica began talking to Ronnie to defuse the situation. Next, Sergeant Wargo and Officer Wolford arrived at the residence. Officer Wolford joined Officer Kopronica near the kitchen door and participated in the conversation with Ronnie. The dialogue lasted about 45 minutes.

Ronnie then moved aside the cart that was blocking the door, and "lunged at Officer Wolford, who attempted to back out of the way." Ronnie stabbed Officer Wolford's upper-left side with the butcher knife. Officer Wolford then stumbled back and fell to the ground. Officer Kopronica did not see the knife go into Officer Wolford, but he did see Ronnie lunge at Officer Wolford with the knife. Next, Officer Wolford threw Ronnie, who fell onto the couch. According to the Untalans, Romeo tried to restrain Ronnie on the couch and the two men wrestled for control of the knife. While on the couch, Ronnie moved in a manner suggesting that he was trying to get up off of the couch. Believing that Ronnie was continuing his attack on Officer Wolford, Officer Kopronica drew his service weapon and fatally shot Ronnie once in the upper left chest area. According to Corazon, Ronnie did not have possession of the knife at the precise moment that he was shot. According to Romeo, he had just finished twisting the knife out of Ronnie's hand when Officer Kopronica fired his weapon. Ronnie's knife attack and Officer Kopronica's fatal shot transpired over a few seconds' time.

## II.

This court reviews a district court's grant of summary judgment de novo. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

The plaintiff has the burden to "show that the defendant is not entitled" to qualified immunity. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). When evaluating the plaintiff's case against qualified immunity, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered on a more specific level." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). We do not reach the second question because no rational juror could find that Officer Kopronica violated Ronnie's rights on the facts supported by the Rule 56 evidence.

## A.

Officer Kopronica lawfully seized Ronnie with gunfire under the totality of the circumstances balancing test enunciated in *Graham v. Connor* because Ronnie posed an immediate threat to others in the area and was actively resisting attempts to restrain him. *See* 490 U.S. 386, 396 (1989).

According to *Graham*, when determining whether the use of deadly force violates a plaintiff's Fourth Amendment rights, the court must perform a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks omitted). A person's interest in his own life is of course a "fundamental interest." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). The court weighs the plaintiff's fundamental interest in his life against the state's interest, as gauged by "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. This circuit has made the threat factor from *Graham* a minimum requirement for the use of deadly force: such force may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm, either to the officer or others. *See Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (holding the use of force excessive when the victim's actions could not have caused a reasonable policeman to perceive a serious threat of physical harm to himself or others).

The Supreme Court has forbidden courts from passing judgment on the police using 20/20 hindsight.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97 (citations omitted). This court also has noted that *Graham*'s prohibition on using 20/20 hindsight "carries great weight" when "all parties agree that the events in question happened very quickly," as here. *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

**1.**

Applying the *Graham* balancing test, from the perspective of a reasonable policeman at the scene, no reasonable juror could disagree that Ronnie posed a serious and immediate threat to the safety of others. Armed with a butcher knife, Ronnie suddenly burst out of the kitchen and lunged at Officer Wolford. Ronnie attacked Wolford and caused him to drop to the ground. Officer Kopronica shot Ronnie within seconds of this attack, after Ronnie had tried to get up off of the couch, while Ronnie was struggling for the butcher knife on the couch with Romeo.

Assuming that Ronnie lost control of the butcher knife just before being shot, by all accounts the amount of time between the loss of such control and the shooting could not have been more than a few seconds and could have been as little as a split-second. JA 88 (Kopronica, "[t]he length of time from when [Ronnie] lunged out of the kitchen until I fired the shot was just a few seconds"), 188 (Romeo, "split second"), 192 (Romeo, "split second"), 206 (Kopronica, "[i]t was unbelievably fast"). Within a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed.

Moreover, because Ronnie lost control of the knife so very briefly before the shot, a reasonable officer could have fired the shot while acting on the perception that Ronnie still had the

knife. "Notwithstanding the possibility of a dispute about whether a knife was actually in [the decedent's] hand at the moment of the shooting, [the officer], and the other officers present, acted on the perception that [the decedent] had a knife in his hand." *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (4th Cir. 1998). As the Fourth Circuit has said: "we do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him." *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994). *See also Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991) ( "Also irrelevant is the fact that [the decedent] was actually unarmed. [The officer] did not and could not have known this. The sad truth is that [the decedent's] actions alone could cause a reasonable officer to fear imminent and serious physical harm."). Officer Kopronica should not be deprived of qualified immunity for reasonably, though perhaps incorrectly in hindsight, perceiving an immediate and serious threat from Ronnie. He therefore is entitled to qualified immunity.

This analysis finds support in *Russo v. City of Cincinnati*, another summary judgment case involving a schizophrenic who attacked police with a butcher knife and was subsequently shot to death. 953 F.2d 1036 (6th Cir. 1992). In *Russo*, Thomas Bubenhofer, the decedent schizophrenic, pointed butcher knives in each hand at a police officer who had been breaking down his apartment door. *Id.* at 1040. After using a Taser on Bubenhofer to little or no effect, the policemen shot Bubenhoffer, who dropped to the ground holding only one knife. *Id.* Bubenhofer then rose, and the officers used the Taser on him two more times. *Id.* at 1041. In response, Bubenhofer "charged up the steps," according to the policemen, and the policemen shot him a second time with a series of shots. *Id.* Bubenhofer fell back down the steps, still holding the knife and remaining conscious. *Id.* Later Bubenhofer got up yet again and "began to come up the stairs, knife in hand, at which point all three officers fired at Bubenhofer." *Id.* All told, the policemen shot him 22 times over the course of these three series of shots. *Id.* About ten to twelve minutes elapsed between the second and third series of shots. *Id.* at 1045. During that time, Bubenhofer dropped his knife. *Id.*

The *Russo* panel held that a rational jury could find only the *second and third* series of shots unjustified. *Id.* Its analysis did not contemplate that the first shooting was unconstitutional. *See id.* Regarding the second and third series of shots, *Russo* stressed that "the record suggests that some *ten to twelve minutes elapsed* between the second and third series of shots, during which time Bubenhofer *apparently dropped his knife*." *Id.* (emphasis added). Key in *Russo*, therefore, was the fact that during these long breaks in between shootings, Bubenhofer was apparently disarmed. *Id.*

Officer Kopronica's single shot at Ronnie is more analogous to the justified first round of shots in *Russo* than it is to the unjustified second or third rounds. Bubenhofer confronted police with knives while Ronnie suddenly lunged out of a doorway with a butcher knife to attack the police. Bubenhofer was shot at that moment. The police in this case, however, refrained from shooting Ronnie until he was in the midst of wrestling with his father for the knife. These actions in both cases created reasonable perceptions of danger. In this case, Ronnie's tangle with Romeo for the knife continued the reasonableness of that perception of danger right up until he was shot.

Officer Kopronica's shot is less analogous to the second and third *Russo* series of shots. True, there is a superficial similarity between Bubenhofer's and Ronnie's cases, in that both had lost control of their respective butcher knives. But this similarity is easily dispelled on the grounds that made Bubenhofer's release of the weapon important in *Russo*: Bubenhofer lay on the floor practically incapacitated for at least ten full minutes. In *Russo*, the combination of (1) *time* (ten minutes), (2) *incapacity* (Bubenhofer lay on the ground essentially immobile), and (3) *release of the weapon* together eliminated, or at least sharply reduced, the reasonableness of any perceived danger from Bubenhofer.

By contrast, in this case only the element of release of the weapon exists. Consideration of the time period involved and Ronnie's capacity to fight back in this case strongly argues for a

conclusion opposite to the one reached in *Russo* regarding the second and third series of shots. As to the time period involved in this case, Ronnie's release of his weapon occurred a very brief moment before the shot. As to Ronnie's capacity to fight back in this case, Ronnie was never alleged to have been lying incapacitated on the ground for long periods as Bubenhofer was. The considerations, outlined above, that made the second and third series of shots potentially unconstitutional in *Russo* were not present in this case.

The Untalans strenuously argue that Ronnie did not pose a threat to Officer Wolford. They point to the testimony of Lieutenant Robert Poli. Lieutenant Poli said that if Ronnie was lying on the couch, Officer Wolford was in no danger. But the *Graham* standard recognizes that danger to anyone in the area is sufficient to justify the use of deadly force. Lieutenant Poli never stated that Romeo was not in danger. Therefore, no reasonable juror could, on the basis of Lieutenant Poli's statement, find that no immediate and serious danger existed.

**2.**

Applying the final listed factor in the *Graham* balancing test—whether the decedent was actively resisting arrest—the City's interest in seizing Ronnie with deadly force is greater because of Ronnie's resistance to Romeo's efforts to restrain him. True, this does not fit the wording of *Graham* perfectly, because Ronnie had not been informed that he was under arrest. *See generally* 490 U.S. at 394-97. The *Graham* test, however, is a totality of the circumstances test, so the court may consider this fact, even if it does not fit the wording of *Graham* precisely. *See id.* The undisputed fact that Ronnie fought back increases the weight that must be given to the state's interest in a deadly-force seizure. Ronnie could not be expected to go quietly. Commensurately, police could constitutionally use more force when seizing him.

Taken together, these factors indicate that no reasonable juror could conclude that Officer Kopronica violated Ronnie's Fourth Amendment rights. The government's interests in abating a serious and immediate threat to others in the area and in seizing someone who had shown a willingness to resist maximize the government's interest in a deadly-force seizure.

**III.**

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment to Officer Kopronica and the City.