RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0292p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DEBBIE JEAN LATITS, as Personal Representative of the
Estate of Laszlo John Latits, Deceased,

　　　　　　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

LOWELL PHILLIPS, Police Officer for the City of
Ferndale,

　　　　　　　　　　　　　　　*Defendant-Appellee*.

No. 15-2306

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-14306—Stephen J. Murphy III, District Judge.

Decided and Filed: December 27, 2017

Before: CLAY and STRANCH, Circuit Judges; BLACK, District Judge.

_____

## COUNSEL

**ON BRIEF:** Kevin Ernst, ERNST LAW FIRM, Detroit, Michigan, Dean Elliott, DEAN
ELLIOTT, PLC, Royal Oak, Michigan, for Appellant. Lindsey A. Peck, SEWARD PECK &
HENDERSON, Royal Oak, Michigan, for Appellee.

　　　　STRANCH, J., delivered the opinion of the court in which BLACK, D.J., joined, and
CLAY, J., joined in part. CLAY, J. (pp. 17–24), delivered a separate opinion concurring in part
and dissenting in part.

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge.  Lowell Phillips, then a Ferndale Police Officer, ended a car chase on the outskirts of Detroit by ramming Laszlo Latits's car off the road and then shooting and killing Latits as he tried to resume flight.  Latits's widow sued former Officer Phillips under 42 U.S.C. § 1983 alleging that Phillips's actions violated the Fourth Amendment.  The district court granted summary judgment to Phillips, concluding that the shooting was reasonable.  We determine that Phillips's use of deadly force was objectively unreasonable, in violation of the Fourth Amendment.  Caselaw existing at the time of the events, however, did not clearly establish the objective unreasonableness of Phillips's actions in the circumstances of this case.  Phillips is therefore entitled to qualified immunity and we must AFFIRM.

## I. BACKGROUND

The events of this case were recorded by video cameras mounted on the dashboards of four separate police cars.  Consequently, we describe the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).  Because this appeal arises from the Defendant's motion for summary judgment, we view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff.  *See Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015) (accepting the plaintiff's version of the facts because they were not "clearly contradict[ed]" by the video).  Facts are also provided by deposition testimony and other evidence presented in the district court.

After midnight on June 24, 2010, Ferndale Police Officer Kenneth Jaklic stopped Latits for turning the wrong way onto a divided boulevard.  Jaklic approached the car with a flashlight.  Latits produced his driver's license and opened his glove box to retrieve his registration and insurance documents.  Officer Jaklic testified that inside the box he saw one or more bags that he suspected to contain marijuana and a pill bottle, all of which Latits attempted to move under the passenger seat.  Jaklic testified that he then told Latits to get out of the car.  The video recorded by the officer's dashboard camera shows that Jaklic took out his gun about eight seconds after

walking up to the car, and then stood at Latits's window shining his flashlight into the car and pointing the gun at the ground for about thirty seconds. Officer Jaklic then raised his gun and pointed it at Latits's head at point-blank range. Latits drove away, and Jaklic ran back to his police car to pursue him.

Officer Jaklic broadcast that he was pursuing a fleeing vehicle and other officers headed in that direction to join the chase. Jaklic announced that he was chasing a suspect for a traffic violation and possible health code violation, including "stashing some narcotics underneath his chair." After fleeing from Jaklic for nearly two minutes (during which time Latits's car cannot be seen clearly on video), Latits entered an empty parking lot. Officer Jaklic's car entered the parking lot and slowly moved into the path of Latits's car, at which time Latits can be seen steering away from Jaklic's car to avoid colliding. Officer Jaklic then broadcast that Latits "tried to ram my vehicle." Another officer can be heard asking to clarify whether Latits rammed the patrol car, to which Jaklic responded: "He tried to." At his deposition, Officer Jaklic admitted that Latits in fact turned his wheel and got out of the way to avoid hitting the patrol car.

At the moment of the near miss of the cars of Latits and Jaklic, the dashboard camera of the Defendant, Officer Phillips, shows that the parking lot where Latits was located was just ahead of Phillips. The district court determined that a reasonable jury could find from the video that Officer Phillips could see that Latits did not try to ram Jaklic and therefore knew that Officer Jaklic's statement otherwise was false.

After avoiding Officer Jaklic's car, Latits fled the parking lot, turning south on to a ten-lane divided highway. Three officers were now chasing close behind Latits: Officer Andrew Wurm first, Officer Jaklic second, and Officer Phillips third.[1] All three had dashboard cameras recording their perspectives of the chase.

---

[1]The Plaintiff submitted evidence to the district court (from a deposition in another case in which the Ferndale Chief of Police discussed Officer Phillips's role in the events of this case) that Ferndale Police Department policy prohibits more than two police cars from actively pursuing a fleeing car without special permission. The Ferndale Chief of Police testified that Officer Phillips violated department policy by joining the pursuit as the third police car without the required permission.

For approximately thirty seconds, Latits led the three officers southbound down the highway at about sixty miles per hour, passing through two red lights. No pedestrians or other cars are visible on the nighttime highway except one parked car two lanes away from Latits. The highway was bounded by a cemetery on one side and a commercial zone and vacant state fairgrounds on the other.

Latits next attempted to make a U-turn but partially ran over the curb of the grassy highway median. Wurm, still the first officer behind Latits, also attempted to make the U-turn, and collided with the rear driver's side of Latits's car.[2] Officer Wurm then broadcast over the police radio: "Oh, I just hit him." Officer Phillips was following shortly behind Officers Wurm and Jaklic, and the district court determined that a jury could find that Phillips knew that Wurm's car hit Latits's car. As the cars tried to reorient on the highway, Officer Wurm again collided with the rear of Latits's car, at which time an officer (presumably Wurm) can be heard exclaiming: "Shit!" Officer Phillips, close behind Wurm and Jaklic, could see Wurm hit Latits a second time. An officer can then be heard saying: "This guy's all over the road, he's hit me several times." The videos, however, show that Latits had not hit any police cars; rather, he had turned to avoid hitting Officer Jaklic and had been hit twice by Officer Wurm.

The two impacts by Officer Wurm's car apparently caused Latits to lose control of his car, which swerved to the right and then back left across three lanes. No pedestrians or cars besides those of Latits and the officers are visible on the video during this time. Latits's car then straightened out and traveled northbound for nearly five seconds. While Latits was swerving, Officer Phillips sped past Officers Jaklic and Wurm and, nearly five seconds after Latits's car had straightened out, Phillips rammed Latits's car from the back left, pushing it across two lanes of traffic and off the road.[3] Officer Phillips's ramming caused Latits's car to spin out onto an area of grass and concrete to the right.

---

[2]Officer Wurm received a written reprimand for intentionally striking the suspect vehicle during the pursuit in violation of Ferndale's chase policy, according to the Ferndale Chief of Police.

[3]This was a so-called PIT maneuver. PIT maneuvers were against Ferndale policy, and the Chief of Police had specifically ordered Officer Phillips never to use a PIT maneuver.

When Latits's car stopped it was parallel and to the right of Officer Phillips's car. Officer Wurm pulled onto the grass parallel to the opposite side of Latits's car. Latits slowly began to drive forward through the opening between the cars of Phillips and Wurm, while Officer Jaklic slowly drove towards the same opening from the opposite direction in an apparent attempt to block it. Latits's and Jaklic's cars then had a very low-speed head-on collision. Officer Jaklic testified that he was not injured and his police car suffered minimal damage to the push bar on its front end.

At about the same time, Officer Phillips jumped out of his car and ran toward Latits's car from behind it.[4] Phillips was alongside Latits's front passenger-side door when Latits started reversing away from Officer Jaklic's car.[5] Latits's car can be seen reversing past Officer Phillips and out of the frame of one dashboard camera with Phillips following on foot. One second later, Latits's car can be seen reversing into the frame of Phillips's dashboard camera, and what is apparently gunshots can be heard. Latits's car rolls to a stop as Phillips enters the frame with his gun raised. The dashboard camera of a fourth officer arriving at the time Latits was shot shows that no cars or persons were immediately behind Latits as he reversed. Officer Phillips, following in the same direction in which Latits was reversing, could see that no one was in Latits's direct path.

Seven shell casings were recovered from the scene matching Officer Phillips's gun.[6] Latits was struck by three bullets and died at the hospital later that morning. The autopsy reported that the direction of the gunshot wounds to Latits's chest and abdomen were from the front to back. Less than four minutes passed from the time Latits first drove away from Officer Jaklic to the time he was shot by Officer Phillips.

---

[4] The Ferndale Chief of Police testified that Officer Phillips violated department procedures by running to the suspect vehicle instead of taking a tactical position using his vehicle as cover.

[5] Officer Phillips claims on appeal that the videotape shows him having to jump out of the way when Latits drove backwards after colliding with Officer Jaklic's car. The video instead shows that as Latits reversed, Phillips was to the side of Latits's car.

[6] At deposition, Phillips recalled firing one volley of only four shots.

Phillips was terminated for his conduct during the pursuit that ended in the shooting death of Latits. Among the reasons for Phillips's termination, the Ferndale Chief of Police cited the following violations of police policy: Phillips engaged in vehicular pursuit as the third police car without permission, passed the secondary and primary vehicles in the pursuit, used a PIT maneuver in violation of a direct order, and ran up to Latits's car instead of taking a tactical position using his vehicle as cover.

The Plaintiff sued under 42 U.S.C. § 1983 alleging that Phillips violated Latits's clearly established Fourth Amendment rights by using deadly force to terminate the chase. The district court granted summary judgment to Phillips, concluding that his use of deadly force was objectively reasonable. Latits timely appealed.

## II. ANALYSIS

### A. Standards of Review

We review grants of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party. *Godawa*, 798 F.3d at 462. To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos. *See Harris*, 550 U.S. at 380. To the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party. *See Godawa*, 798 F.3d at 463. Summary judgment is appropriate if the materials in the record show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* at 462.

This suit implicates the doctrine of qualified immunity. Public officials are entitled to qualified immunity from suits for civil damages if either the official's conduct did not violate a constitutional right or if that right was not clearly established at the time of the conduct. *Id.* at 462–63. (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). Courts may consider those two inquiries in either order. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

**B.  Whether a Constitutional Right Was Violated**

The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive force by law enforcement officers. *Id.* at 463.  While officers may use some degree of physical coercion to make an arrest, the Fourth Amendment requires the amount of force to be objectively reasonable under the totality of the particular circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Among the factors analyzed to determine the constitutionally permissible amount of force are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

The reasonableness inquiry is an objective one, considered from the perspective of a hypothetical reasonable officer in the defendant's position and with his knowledge at the time, but without regard to the actual defendant's subjective intent when taking his actions. *Id.* at 397. The court must avoid "the 20/20 vision of hindsight," recognizing that officers in tense and evolving situations may have to make a split-second decision about the amount of force that is necessary. *Id.* at 396–97.  The reasonableness analysis thus includes some "built-in measure of deference to the officer's on-the-spot judgment." *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (citations omitted).  At the same time, the "fact that a situation unfolds quickly does not, by itself, permit officers to use deadly force.  Rather, qualified immunity is available only where officers make split-second decisions in the face of serious physical threats to themselves and others." *Id.* at 766–67 (internal quotation marks, brackets, and citations omitted).

As a general rule, the Fourth Amendment prohibits the use of deadly force to prevent the escape of fleeing suspects unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 1, 11 (1985).  Of the three non-exclusive factors listed in *Graham*, "the threat factor is 'a *minimum* requirement for the use of deadly force.'" *Mullins*, 805 F.3d at 766 (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)); *see also Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006) (stating that a person has a "right not to be shot unless they are perceived as posing a threat to officers or others").

The Sixth Circuit has developed "a consistent framework in assessing deadly-force claims involving vehicular flight." *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014). The "critical question" is whether the officer had objective "'reason to believe that the [fleeing] car presents an imminent danger' to 'officers and members of the public in the area.'" *Id.* (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)). Deadly force is justified against "a driver who objectively appears ready to drive into an officer or bystander with his car," but generally not "once the car moves away, leaving the officer and bystanders in a position of safety," unless "the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car." *Id.* (citations omitted). The Sixth Circuit has found deadly force justified by prior interactions demonstrating continuing dangerousness only when the "suspect demonstrated multiple times that he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around." *Cupp*, 430 F.3d at 775 (characterizing the suspects in both *Scott v. Clay Cty.*, 205 F.3d 867, 872 (6th Cir. 2000), and *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)).

To determine whether Latits presented an imminent danger to officers or the public at the time Officer Phillips shot him requires analysis of both the moments before the shots were fired and the prior interactions between Latits and Phillips. Just before the shots, the videos show that Latits reversed past Phillips before Phillips raised his gun and before gunshots can be heard. In *Hermiz v. City of Southfield* we stated that: "A reasonable jury drawing inferences in the estate's favor could determine that an officer that aimed and fired shots while to the side of the vehicle," after "the hood of [the suspect's] car already passed the point where it could harm [the officer]," "would have had time to realize that he was no longer in the path of the car and no longer in immediate danger." 484 F. App'x 13, 16 (6th Cir. 2012). Likewise, because Officer Phillips fired after Latits's car had passed the point where it could harm him, Phillips had time to realize he was no longer in immediate danger.

The evidence also shows that Officer Phillips could see that no other officers or other persons were in Latits's path when Phillips fired. Latits was reversing away from Officers Jaklic and Wurm, who were in front of him and to his left, respectively. Officer Danielson's dashboard

camera shows that Phillips's car was between her car and Latits's car at the time of the shooting, so Latits was reversing away from her as well.  There were no other officers on the scene, and there is no evidence or suggestion by the Defendant that members of the public were in the immediate path of Latits's car.  *Cf. Cupp*, 430 F.3d at 774 (finding deadly force unreasonable where the "record does not establish the presence of any bystander . . . whose physical safety could have been endangered by [the driver's] actions").  The videos displaying Officer Phillips's position show that he could see that no persons or cars were in the immediate path on which Latits was traveling.

Phillips testified that after colliding with Officer Jaklic's car, Latits looked directly back at him, revved his engine, and moved the car towards Phillips, at which time Phillips fired his weapon.  The video evidence, however, contradicts this testimony and we view the evidence in the light depicted by the video.  *See Harris*, 550 U.S. at 381.  Furthermore, the record includes no evidence suggesting that by continuing to reverse, Latits's intention was anything except to flee.  Given the above analysis, Latits did not objectively appear ready to drive into someone when Officer Phillips shot him.

Several of our cases have concluded that deadly force was objectively unreasonable when the officer was to the side of the moving car or the car had already passed by him—taking the officer out of harm's way—when the officer shot the driver.  *Godawa*, 798 F.3d at 466–67; *Hermiz*, 484 F. App'x at 16; *Sigley v. City of Parma Heights*, 437 F.3d 527, 531, 537 (6th Cir. 2006); *Cupp*, 430 F.3d at 774–75.  But the fact that no one was in the car's direct path at the time the driver was shot does not end the analysis.  *Cass*, 770 F.3d at 376 ("[T]he inquiry is not nearly so narrow.").  We must also look to the prior interactions between Latits and Officer Phillips and the potential of imminent danger to other officers or members of the public in the area.  *See id.*

Because it is undisputed that Latits was fleeing to avoid arrest, we turn to the *Graham* factor that analyzes the severity of the crime at issue.  Officer Phillips knew from Officer Jaklic's broadcast that Latits was originally suspected of possessing narcotics—not a violent crime.  The second *Graham* factor asks if the individual poses an immediate threat to the safety of an officer or others.  The videos show that Officer Phillips first observed Latits's car as it was turning to avoid Officer Jaklic's car; the district court determined that Phillips could see that Latits did not

try to ram Jaklic's car. Latits then fled at no more than sixty miles per hour down an almost entirely empty ten-lane divided highway at night. In his pursuit of Latits, Phillips passed only one parked car, and no other pedestrians, cyclists, or non-police cars are visible on Phillips's dashboard camera for the remainder of the chase. The videos make clear that Phillips observed Latits drive partially over a grassy median, attempting a U-turn, and then saw Officer Wurm's car hit Latits's car twice, and that Latits did not ram Officer Wurm. Phillips then observed Latits swerve across the empty highway, which was bordered by a cemetery and largely vacant state fair grounds. As Officer Phillips sped past the two officers preceding him in the pursuit (in violation of department policy), he could observe that Latits was able to straighten his car for about five seconds before Phillips rammed him off the road (also in violation of department policy and a direct order). Up to the point when Latits's car came to a stop after Officer Phillips rammed it off the road, Latits had shown no intent to injure the officers. Though Latits did briefly lose control and swerve after Wurm hit him twice (for which Officer Wurm was disciplined for violating department policy), there were no members of the public nearby to be endangered and Latits appeared to regain control of his car before Officer Phillips rammed him.

Finally, after Latits's car had come to a stop off the road, Officer Phillips observed Latits slowly drive forward and collide with the front of Officer Jaklic's car. However, the video permits the reasonable interpretation that this collision was accidental, in which case it would provide less justification for deadly force. *See Sigley*, 437 F.3d at 536; *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003) (holding that a collision with a police car that could be viewed by a jury as accidental did not automatically justify deadly force); *cf. Godawa*, 798 F.3d at 463 (finding that deadly force was unreasonable because a jury could determine that the officer initiated the impact with the driver's car rather than the driver intentionally targeting the officer). Moving forward through the gap between the cars of Phillips and Wurm, Latits was not facing head-on with Officer Jaklic's car until one to two seconds before their impact, likely too late for either car to avoid the low-speed collision. Viewing the video in the light most favorable to the Plaintiff, the slow collision reveals intent to flee, not intent to injure officers. Whether a fleeing suspect showed objective intent to injure officers is relevant to whether the suspect presented sufficient danger to justify deadly force. *See Sigley*, 437 F.3d at 536 (reversing a grant of summary judgment where it was not clear whether the suspect "intended to injure" others). The

videos additionally reveal that Latits did not commit felonious assault, which is also relevant to the *Graham* factor addressing the severity of the crime. *See Godawa*, 798 F.3d at 466 (reversing the district court for not viewing the evidence in the light most favorable to the Plaintiff when considering which crimes the fleeing driver had committed).

Permitting Latits to continue to flee instead of shooting him would not have put the public in imminent danger either. The chase occurred under circumstances in which risk to the public was relatively low. Latits drove at a maximum of sixty miles an hour on a large, effectively empty highway surrounded by non-populated areas (a cemetery and vacant state fairgrounds), passing no pedestrians, cyclists, or motorists besides the police trailing him. *Cf. Walker v. Davis*, 649 F.3d 502, 503 (6th Cir. 2011) (affirming the denial of summary judgment to officer who rammed and killed a motorcyclist leading police on a five-minute chase at sixty miles per hour through a red light down an empty highway in rural Kentucky). Latits's flight was on an effectively empty highway; he had shown no intention or willingness to drive recklessly through residential neighborhoods. Altogether, Latits's conduct prior to being shot, when viewed in the light most favorable to the Plaintiff, showed a persistent intent to flee but not an intent to injure, and never placed the public or the officers at imminent risk.

We must, however, also view the facts with due deference to the quick decisions Officer Phillips had to make in a tense, uncertain, and rapidly evolving situation. *Graham*, 490 U.S. at 396–97. Phillips testified that he subjectively believed Officer Jaklic's broadcast that Latits had tried to ram Jaklic's car, and thought Latits was trying to ram an officer a second time when he saw Latits's car collide with Jaklic's car about five seconds before Phillips fired at Latits. "We have previously held that '[w]ithin a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed.'" *Mullins*, 805 F.3d at 767 (quoting *Untalan*, 430 F.3d at 315). But we must undertake an objective analysis, viewing the evidence in the light most favorable to Latits, as we have done above. Thus, both *Mullins* and *Untalan,* in which we held that deadly force was reasonable because a dangerous situation had evolved into a safe one before the officers had a chance to realize the change, are distinguishable. There officers were engaged in physical, hand-to-hand confrontations with a suspect who moments before being shot

had held a gun or knife.  *Id.*; *Untalan*, 430 F.3d at 315.  Here, Officer Phillips's life was never in imminent danger, and, under the objective analysis of Latits's slow collision with Officer Jaklic's car, no other officer's life was endangered in the moments before Phillips fired.

Furthermore, the short time between the collision with an officer's vehicle and the shooting does not, by itself, justify deadly force.  In *Godawa*, for example, we held that it was unreasonable for the officer to shoot at the driver two seconds after the officer had contact with the driver's car, even though the officer subjectively believed the driver had just targeted and assaulted him with his car.  798 F.3d at 466; *see also Cupp*, 430 F.3d at 775 ("The fact that this was a rapidly evolving situation does not, by itself, permit him to use deadly force.").  If the shock of a collision to the officer was insufficient on its own to justify deadly force in *Godawa*, such shock alone is also insufficient here, particularly where Latits collided with a different officer than the one who shot him.

Phillips also argues that some level of recklessness permits deadly force even without the driver's intent to injure or ram, because extremely reckless driving can create the imminent threat to others that can justify deadly force.  *See, e.g., Plumhoff v. Rickard*, 134 S. Ct. 2012, 2017–18, 2021–22 (2014); *Harris*, 550 U.S. at 379–80, 384.  But Supreme Court and Sixth Circuit precedent finding deadly force reasonable to end a car chase is distinguishable because those cases involved significantly more dangerous prior conduct by the driver, imminent risk of harm to an identifiable party, or objective evidence of the driver's intent to harm officers.

In several cases, the suspects demonstrated obvious willingness to endanger the public by leading the police on chases at very high speeds and through active traffic.  *See Plumhoff*, 134 S. Ct. at 2017, 2021–22 (suspect swerved through traffic at over 100 miles per hour, passing more than two dozen vehicles and forcing several to alter their course); *Harris*, 550 U.S. at 375, 379–80 (suspect sped down narrow two-lane roads at over 85 miles per hour swerving around more than a dozen cars on both sides of the double-yellow line, forcing cars on both sides to the road shoulder); *Clay Cty.*, 205 F.3d at 872 (suspect led police on twenty-minute chase up to 100 miles per hour, forcing a motorist off the road); *Freland*, 954 F.2d at 344 (suspect fled at over 90 miles per hour and ultimately crashed into a stationary police car).  In other cases, officers fired only after seeing another officer on foot in imminent danger of being injured by the suspect's car or

already actually struck by the suspect's car. *See Cass*, 770 F.3d at 372–73, 376 (officers fired after suspect's car struck both of them, knocking one down); *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 151, 153 (6th Cir. 2013) (suspect collided with police car while an officer was standing next to it, the officer's arm became trapped in the police car's door and he was forced to backpedal as the suspect's car pushed the officer's car, at which time another officer on the scene fired); *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 484 (6th Cir. 2007) (officer who had his arm through the suspect's car window was knocked down as the suspect's car accelerated, at which time another officer fired). Finally, some cases featured suspects who officers reasonably believed to be carrying guns that they were willing to fire at officers (in addition to highly reckless driving). *See Mullenix v. Luna*, 136 S. Ct. 305, 306, 309 (2015); *Dudley v. Eden*, 260 F.3d 722, 724, 727 (6th Cir. 2001). Phillips argues that this case is comparable to *Plumhoff*, *Hocker*, *Williams*, and *Freland*. As explained above, these cases are distinguishable.

In sum, considering the totality of the circumstances in the light depicted by the video and otherwise most favorable to the Plaintiff, we conclude that Latits did not present an imminent or ongoing danger and therefore that the shooting was not objectively reasonable. In addition, although police procedures do not set the bounds of the Fourth Amendment, we consider it relevant that Officer Phillips repeatedly violated police procedures in both ramming Latits and running up to his car. *See Mullins*, 805 F.3d at 768 ("Whether or not an officer is following police procedures is certainly relevant to the question of reasonableness in excessive force cases, but it is not necessarily conclusive proof that the Constitution has been violated."). For these reasons, we conclude that Officer Phillips's use of deadly force was objectively unreasonable and in violation of Latits's constitutional rights.[7]

---

**7**We need not address the parties' arguments about a potential second volley of shots. Whether Officer Phillips fired the seven bullets in one or two volleys, all shots were fired within a few seconds of one another and at a time when the situation was the same for purposes of this reasonableness analysis (Latits's car had already passed Officer Phillips and was moving away from all officers on the scene).

**C. Whether that Right was Clearly Established**

Even if Officer Phillips violated Latits's constitutional right, he is entitled to qualified immunity if that right was not clearly established at the time of the violation—June 2010. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308 (citation and internal quotation marks omitted). For this to occur, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citation omitted). The precedent clearly establishing a right can be in the form of a case of "controlling authority or a robust consensus of cases of persuasive authority." *Plumhoff*, 134 S. Ct. at 2023 (citation and internal quotation marks omitted).

The Supreme Court has instructed that the question that must be beyond debate is a specific one: Was the "*particular* conduct" violative "in light of the specific context of the case." *Mullenix*, 136 S. Ct. at 308 (citations omitted); *see also Bolick v. City of E. Grand Rapids*, 580 F. App'x 314, 320–21 (6th Cir. 2014) ("[W]e must "define the rights at issue 'at the appropriate level of generality—a reasonably particularized one.'" (quoting *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012))). Stating that clearly established law "does not require a case directly on point," the Supreme Court recently reversed a denial of qualified immunity because the lower court "failed to identify a case where an officer under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017) (citation and brackets omitted). Accordingly, we look to controlling authority, extant at the time of the violation, entailing similar conduct and circumstance.

The Plaintiff has not identified any caselaw where an officer under sufficiently similar circumstances was held to have violated the Fourth Amendment, and neither have we. The Plaintiff relies on *Sigley* and *Cupp* to argue that Phillips violated clearly established law. The dissent also argues that *Sigley* and *Cupp* had clearly established by 2010 that Phillips's conduct was unconstitutional. We have held that, as of 2007, *Sigley* and *Cupp* had clearly established that "shooting a driver while positioned to the side of his fleeing car violates the Fourth Amendment, absent some indication suggesting that the driver poses more than a fleeting threat."

*Hermiz*, 484 F. App'x at 17.**8** But *Sigley* and *Cupp* are distinguishable from this case in a material way: Those cases involved officers confronting a car in a parking lot and shooting the non-violent driver as he attempted to *initiate* flight. *See Sigley*, 437 F.3d at 530–31; *Cupp*, 430 F.3d at 769–70. Here, Phillips shot Latits *after* Latits led three police officers on a car chase for several minutes—during which Latits repeatedly sought to evade capture—an important factual distinction that sets this case apart from *Sigley* and *Cupp*.**9** This case presents a close call, but in light of the Supreme Court's recent analyses in *Mullenix* and *Pauly*, these cases do not suffice. They did not involve many of the keys facts in this case, such as car chases on open roads and collisions between the suspect and police cars. Accordingly, although we now hold that Phillips's conduct fell outside the bounds of the Fourth Amendment, controlling authority at the time of the events had not clearly established the rights we identify today.

Although it is relevant to the first prong of the qualified immunity analysis, *see supra* Part II.B at 13, Phillips's violation of Ferndale Police Department policies does not require a different outcome. "[T]he fact that an officer's conduct merely violates a departmental policy does not cause that officer to lose their qualified immunity." *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citations omitted); *see also City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) ("Even if an officer acts contrary to her training, however . . . that does not itself negate qualified immunity where it would otherwise be warranted."); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992) ("[T]he Supreme Court has indicated that the violation of established procedure alone is insufficient to overcome a qualified immunity claim." (citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984))). It must have been clearly established that the conduct at issue violates the Constitution, not internal policies.

This case establishes important constitutional parameters. At the time of the actions of Officer Phillips, however, it cannot be said that existing precedent made it clear to reasonable

---

**8**While *Hermiz* itself is not controlling authority as an unpublished case, *Sigley* and *Cupp*, the cases that established the caselaw cited in *Hermiz*, are controlling.

**9**The dissent also raises *Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008), but that case, too, is materially distinguishable. There, the driver voluntarily pulled over in response to police sirens, and the court concluded that at the time he was shot, no one was in danger and his car was "blocked in." *Id.* at 482.

officials that what Phillips did violated the Fourth Amendment. Thus, this case fails to satisfy the "clearly established" prong of the qualified immunity doctrine.

### III. CONCLUSION

We hold that Officer Phillips's conduct was objectively unreasonable and in violation of the Fourth Amendment. Its unreasonableness, however, was not clearly established at the time of Officer Phillips's actions, and he is therefore entitled to qualified immunity. For that reason, we must affirm.[10]

---

[10]Because we affirm the grant of summary judgment and the case will be dismissed, we need not address the parties' arguments regarding discovery and punitive damages.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

CLAY, Circuit Judge, concurring in part and dissenting in part. The majority spends the bulk of its opinion explaining how Officer Phillips' use of deadly force was objectively unreasonable, citing case upon case (many from before 2010, the year of the incident in question) to conclude that Officer Phillips violated Latits' constitutional rights. In the final stretch, however, the majority abruptly shifts gears to hold that Latits' constitutional rights were not clearly established and that Officer Phillips is therefore entitled to qualified immunity. In so holding, the majority has created a nearly impenetrable barrier for plaintiffs seeking to vindicate their rights against governmental officials. Because I believe that the majority opinion is contrary to governing case law, which clearly establishes that an officer may not shoot a fleeing suspect who poses no danger to others, I respectfully dissent.

The facts, as revealed by the record and as presented by the majority, are as follows: On the night of June 24, 2010, City of Ferndale Police stopped Latits for turning the wrong way onto a divided boulevard. Officer Jaklic approached the car and noticed Latits attempting to hide what appeared to be drugs. Jaklic told Latits to get out of the car, and Latits took off. Three squad cars then pursued Latits on a chase through a parking lot and down an empty highway at speeds not exceeding 60 m.p.h. Latits' vehicle came to a temporary halt when he tried to make a U-turn over the curb of the grassy highway median. At this point, Officer Wurm attempted to make the same U-turn and hit Latits' vehicle. Officer Wurm tried to reorient his vehicle, and he hit Latits a second time. Latits straightened out his vehicle and began traveling northbound, when, about five seconds later, Officer Phillips sped past Jaklic and Wurm and rammed into Latits, thrusting Latits' car across two lanes of traffic and off the road. Latits spun out to an area of grass and concrete, leaving him parallel with Phillips' car, thus ending the chase. All told, the chase lasted about three minutes. And through the entirety of it, the only collisions that Officer Phillips saw occurred when Officer Wurm twice hit Latits, and when Phillips, himself, rammed into Latits' back left. From Phillips' vantage point, he could see that Latits had repeatedly tried to maneuver around the officers' cars to avoid hitting them.

With Latits stopped, Officer Wurm pulled onto the grass parallel to Latits and opposite from Phillips. Latits slowly began to drive forward through the opening between Phillips and Wurm, while Officer Jaklic slowly drove toward Latits' front to block him in. Latits and Jaklic had a very low-speed head-on collision, in which Jaklic was not injured and his car sustained minimal damage.

In violation of police procedure, Officer Phillips jumped out of his car and ran toward Latits' car from behind it. Phillips was standing alongside Latits' front passenger-side door as Latits started backing away from Officer Jaklic's car. Although Phillips could see that no cars or persons were immediately behind Latits as he reversed, Phillips opened fire on Latits, and Latits' car rolled to a stop. Latits was struck by three bullets and died at the hospital later that morning.

The unconstitutional nature of Phillips' conduct would have been clear to a reasonable police officer. Indeed, it was clearly established under *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), that police officers may not fire at non-dangerous fleeing felons such as Latits. *See Bouggess v. Mattingly*, 482 F.3d 886, 894–95 (6th Cir. 2007) (applying *Garner* to hold that an officer who employs deadly force against a fleeing suspect without reason to believe that the suspect is armed or otherwise poses a serious risk of physical harm is not entitled to qualified immunity). In *Garner*, the Supreme Court held that the "use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

Although *Garner* did not involve a preceding car chase, its holding was clear enough to have placed Phillips on notice that his conduct was unconstitutional. *Bouggess*, 482 F.3d at 895 ("Our circuit and others have held that some cases can be so obvious under *Garner* and governing circuit precedent that officers should be presumed to have been aware that their conduct violated constitutional standards.") (citing *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) and *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996)). *Garner* made plain that deadly force cannot be used against an escaping suspect who does not pose an immediate danger to anyone. That rule applies here, where reasonable police officers in Phillips' position

would not have perceived a threat or danger to public safety. This conclusion is not changed by the fact that the seizure occurred following a car chase that was not executed under hazardous circumstances and where no parties (except evidently the decedent) were at risk.

The majority relies on *Mullenix v. Luna*, 136 S.Ct. 305 (2015), to hold that it was not clearly established that an officer in Phillips' position was prohibited from using deadly force against a fleeing suspect. In *Mullenix*, officers approached the plaintiff's car and told him that he was under arrest. 136 S.Ct. at 306. The plaintiff sped off and led police "on an 18-minute chase at speeds between 85 and 110 miles per hour." *Id.* During the pursuit, the plaintiff twice called the police dispatcher "claiming to have a gun and threatening to shoot at police officers if they did not abandon their pursuit." *Id.* A police officer positioned himself on a highway overpass and fired at the vehicle, killing the plaintiff. *Id.* The relevant inquiry, the Court explained, "was whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the [particular] situation [he] confronted." *Id.* (internal quotation marks and citation omitted). The Court concluded that none of its precedents "squarely govern[ed]" the facts presented, and therefore, "[e]ven accepting that these circumstances fall somewhere between [existing cases], qualified immunity protects actions in the 'hazy border between excessive and acceptable force.'" *Id.* at 306, 312 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)). Nonetheless, the Court distinguished *Mullenix* from other cases where the circuits denied immunity to officers who shot suspects "who may have done little more than flee at relatively low speeds." *Id.* at 312 (citing *Walker v. Davis*, 649 F.3d 502, 503 (6th Cir. 2011); *Kirby v. Duva*, 530 F.3d 475, 479–80 (6th Cir. 2008); *Adams v. Speers*, 473 F.3d 989, 991 (9th Cir. 2007); *Vaughan v. Cox*, 343 F.3d 1323, 1330–31, and n.7 (11th Cir. 2003)).

Unlike *Mullenix*, this is not a case where a police officer may have needed more judicial guidance to determine whether the particular risk justified the use of deadly force. Indeed, the majority concludes that Latits "did not present an imminent or ongoing danger" to officers or to any civilians. This case therefore falls into the category of cases that *Mullenix* distinguished— *i.e.*, those squarely controlled by *Garner*.

In reaching its conclusion that Latits' right to be free from the use of deadly force in these circumstances was not clearly established, the majority markedly raises the legal barrier posed by

the qualified immunity defense beyond any existing legal standard, making it virtually impossible for plaintiffs to overcome the defense even under circumstances where their rights have obviously been violated. The majority quotes *Mullenix* as holding that "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." 136 S. Ct at 308 (internal quotation marks and citation omitted). The majority then takes this general proposition and applies it literally, asking whether—along a continuum of more or less reasonable officials—*any* official could have believed that he was not violating the right. If any official could have so believed, the majority seems to conclude, then the right was not clearly established and hence there was no actionable violation. Under the majority's standard, no plaintiff could overcome a qualified immunity defense if *any* official could conceivably believe that he was not violating the plaintiff's rights. But this newly minted standard is not the law. Instead, "the crux of the qualified immunity test is whether officers have 'fair notice' that they are acting unconstitutionally." *Mullenix*, 136 S. Ct. at 314 (Sotomayor, J., dissenting) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

It was clearly established at the time of the shooting, based on Supreme Court and Sixth Circuit caselaw, that an officer may not use deadly force against a fleeing felon who poses no threat to others. Indeed, as early as 1983, this Court held:

> Before taking the drastic measure of using deadly force as a last resort against a fleeing suspect, officers should have probable cause to believe not simply that the suspect has committed some felony. They should have probable cause also to believe that the suspect poses a threat to the safety of the officers or a danger to the community if left at large.

*Garner v. Memphis Police Dept.*, 710 F.2d 240, 246 (6th Cir. 1983). Sixth Circuit caselaw is in consensus on this point. *See, e.g., Bouggess*, 482 F.3d 886 (denying qualified immunity to officer who employed deadly force against a fleeing suspect without reason to believe that the suspect was armed or otherwise posed a risk of physical harm); *Sigley v. City of Parma Heights*, 437 F.3d 527, 537 (6th Cir. 2006) (denying qualified immunity to an officer who shot a fleeing

suspect where, "[v]iewing the facts in a light most favorable to the plaintiff, [the officer] was running behind [the suspect's] car, out of danger, and [the suspect] drove in a manner to avoid others on the scene in an attempt to flee."); *Dickerson*, 101 F.3d at 1152 (holding that despite uncontroverted evidence of serious danger to officers stemming from the suspect's clear possession of a weapon, his recent firing of his weapon, and his threatening language toward the police, because it was undisputed that the suspect was nonthreatening *when he was shot*, the officer was not entitled to qualified immunity); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1045 (6th Cir. 1992) ("[U]nder this court's clearly established precedent, a person has 'a right not to be shot unless he [is] perceived to pose a threat to the pursuing officers or others.'") (quoting *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)); *Bibb*, 840 F.2d at 350 (holding that where an officer caught a suspect dismantling the officer's car and then warned the suspect to stop, the officer was not entitled to qualified immunity for shooting and killing the suspect in mid-flight). This case law consensus has since been reaffirmed in cases like *Godawa v. Byrd*, 798 F.3d 457 (6th Cir. 2015) and *Walker*, 649 F.3d 502.

Three cases in particular warrant further discussion: *Smith v. Cupp*, *Sigley v. City of Parma Heights*, and *Kirby v. Duva*. In *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005), this Court addressed materially similar facts to the case at hand and held that the use of deadly force under the circumstances violated the Fourth Amendment. No subsequent controlling precedent has diminished the clarity of *Cupp*'s holding or its applicability to the present case.

In *Cupp*, this Court concluded that an officer was not entitled to qualified immunity for his use of deadly force against a man fleeing in a car. In that case, the police officer had arrested the plaintiff, whom the officer perceived to be intoxicated, for making harassing phone calls in his presence. *Id*. at 769. The officer placed the compliant plaintiff in the back of his police cruiser while he went to talk with a tow truck driver. The plaintiff then moved from the back seat to the front and began to flee the scene in the police officer's vehicle. The plaintiff drove the police vehicle toward the officer and the tow truck driver. The officer moved out of the way of the vehicle and fired four fatal shots at the plaintiff as he drove past. The officer claimed that the plaintiff had directed the vehicle at him and the tow truck driver and that he shot the plaintiff in self-defense. *Id*. at 770. The tow truck driver stated that the plaintiff may have redirected the

vehicle in order to follow the direction of the road, rather than to target the officer and himself. *Id*. at 774. The tow truck driver also stated that the officer was "running towards the patrol car" when he fired shots at the plaintiff. *Id*.

After considering the evidence under the plaintiff's version of events, this Court concluded that the officer violated the plaintiff's constitutional rights. The Court stated:

> According to the plaintiffs' evidence, [the officer] shot Smith after the police cruiser was past [the officer] and there was no immediate danger to anyone in the vicinity. [The officer's] use of force was made even more unreasonable by the fact that Smith had been cooperative up to this point, and was arrested for the nonviolent offence of making harassing phone calls. Although there was some danger to the public from Smith's driving off in a stolen police car, the danger presented by Smith was not so grave as to justify the use of deadly force.

*Id*. at 773. The Court said that a reasonable officer in this position "would not have perceived danger to anyone at the scene," including himself. *Id*. at 774. The Court further explained that, "[a]lthough this circuit's previous cases give substantial deference to an officer's decision to shoot an unarmed suspect in a car chase, the officer must have reason to believe that the car presents an imminent danger." *Id.* at 775.

Similarly, in *Sigley*, police arranged a controlled buy-bust operation to arrest a suspected ecstasy dealer. 437 F.3d at 529. An informant parked his vehicle next to the suspect's, and the two completed a transaction through their driver's side windows. *Id.* at 530. When the deal was complete, officers closed in, blocking the suspect's car with their vehicles. *Id.* Several officers exited their vehicles, positioning themselves around the suspect's vehicle, and ordered him to stop his vehicle. *Id.* In the plaintiff's version of events, the suspect was trying to maneuver his vehicle around the officers' in an attempt to flee when an officer pointed his gun into the suspect's driver's side window and shot him in the back. *Id.* at 531. This Court denied qualified immunity to the officer, holding that, "viewing the facts in a light most favorable to the Plaintiff, [the officer] was running behind [the suspect's] car, out of danger, and [the suspect] drove in a manner to avoid others on the scene in an attempt to flee. Accepting these facts as true, [the officer] would have fair notice that shooting [the suspect] in the back when he did not pose an immediate threat to other officers was unlawful." *Id.* at 537 (citing *Garner*, 471 U.S. at 11 and *Sample*, 409 F.3d at 697).

The majority contends that *Cupp* and *Sigley* are insufficiently similar to the facts in this case in order for it to be clearly established that Phillips' conduct violated the law. It is a truism that every case is distinguishable from every other. But the degree of factual similarity that the majority's approach requires is probably impossible for any plaintiff to meet. Indeed, the majority's attempt to meaningfully distinguish *Cupp* and *Sigley* is entirely unpersuasive. The majority says that these cases are different from the instant case insofar as "each involved little more than one or more officers confronting a car in a parking lot and shooting the driver as he attempted to initiate flight." That is precisely the situation we have here.[1] Latits was shot as he was slowly backing away and attempting to resume his flight from police. Unlike the plaintiff in *Mullenix*, Latits made no threats, and he showed no intention to harm the officers or others. Absent some indication that Latits presented more of a threat than the suspects in *Cupp* or *Sigley*, preventing the resumption of a flight instead of a flight in the first instance is a distinction without a difference.

Moreover, *Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008), invites even closer comparison. In *Kirby*, police officers surrounded the plaintiff's car during a traffic stop and opened fire on the vehicle when the plaintiff tried to escape. Viewing the facts in the light most favorable to the plaintiff, the evidence showed that the plaintiff was attempting to maneuver his car in a non-threatening manner around the officers and their vehicles and that he was "[n]ot [going] very fast." *Id.* at 479 (alteration in original). Indeed, one witness testified that it looked like the plaintiff "was trying to pull out of a parallel parking spot to get around [the officer's vehicle]." *Id.* "More importantly, under [the plaintiff's] version of the story, none of the officers were ever in harm's way." *Id.* In these circumstances, the Court held that "[t]he plaintiffs' version of the events . . . supports a holding that defendants violated [the decedent's] Fourth Amendment right to be free from excessive force." *Id.* at 482. The Court explained:

> Under that version, [the plaintiff's vehicle] was moving slowly and in a non-aggressive manner, could not have hit any of the officers, and was stationary at

---

[1]Although the majority correctly points out that Latits had just led police officers on a car chase for several minutes, if *Dickerson* tells us anything, it is that an officer's conduct must be judged on the circumstances that confronted the officer *at the time* he took the action. 101 F.3d at 1152 (holding that although the plaintiff had been drunk and had fired nine shots inside his home prior to the officers' arrival, officers were not justified in shooting him because at the time he was shot he was walking with his hands by his side officers).

the time of the shooting. Consequently, reasonable police officers in defendants' positions would not have believed that [the plaintiff] 'pose[d] a threat of serious physical harm, either to the officer[s] or to others.'

*Id.* (citing *Garner*, 471 U.S. at 11). The Court further held that *Garner* had clearly established that "police officers may not fire at non-dangerous fleeing felons." *Id.* at 483. The majority attempts to distinguish *Kirby* on the grounds that "at the time he was shot, no one was in danger and his car was 'blocked in'." This is a curious distinction to draw, when one considers that the majority has concluded that *in this case* the Plaintiff similarly posed no danger to others.

Officer Phillips presented no evidence that Latits was violent, that he had a weapon, or that he was going to endanger other individuals in the area. All that can be said about Latits' driving, based on the majority's description of the events leading up to the shooting, is that he initiated a chase "in which risk to the public was relatively low," that he tried to maneuver around officers, like the plaintiffs in *Sigley* and *Kirby*, and that his vehicle was struck multiple times by the officers' vehicles. Moreover, when Officer Phillips shot him, Latits had shown no intention to harm the police officers, and Phillips could see that no officers or other persons were in Latits' path as he backed away. Under these circumstances, it would have been clear to any reasonable officer that they could not use deadly force against Latits.

Again, applicable case law clearly establishes that an officer should not be protected by qualified immunity when the shooting victim poses no immediate danger to the officer or to the public. Our panel is unanimous in its conclusion that the officer in this case acted in an objectively unreasonable manner and needlessly cost a person his life. Because I also believe that Latits' right not to be seized by deadly force when fleeing arrest was clearly established at the time he was killed, I respectfully dissent.